**E-Filed 5/23/07**

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ALISAL WATER CORPORATION, et al.,<br><br>    Defendants. | Case Number C 97-20099 JF (HRL)<br><br>ORDER[1] RE OUTSTANDING MATTERS |

This order addresses a number of outstanding matters, discussed below:

**A.   Attorneys' Fees Requested In Receiver's Status Report For The Period May 1, 2006 Through October 31, 2006**

The Receiver's status report for the period May 1, 2006 through October 31, 2006, requests $130,764.74 for services provided by the Receiver, attorneys and engineers. On January 26, 2007, the Court heard oral argument regarding this status report and Defendants' objections thereto. On January 29, 2007, the Court issued an order directing that Defendants pay the requested Receiver's fees and the fees of the engineers. With respect to the attorneys' fees, the

---

[1] This disposition is not designated for publication and may not be cited.

Case No. C 97-20099 JF (HRL)
ORDER RE OUTSTANDING MATTERS
(JFLC2)

Court directed the Receiver to reexamine the fees to determine whether some of the fees properly should be paid by Monterey County. The Court further directed the parties to meet and confer regarding the disputed attorneys' fees and stated that if the matter remained unresolved the parties could present argument at a subsequent evidentiary hearing on March 1, 2007.

It does not appear that the parties have resolved the dispute, nor did any party raise the attorneys' fees issue at the evidentiary hearing on March 1, 2007. However, the Receiver did file a supplemental declaration on February 13, 2007, stating that of the $55,506.04 in attorneys' fees requested for the period in question, he had recovered $5,174.00 from Monterey County. The Receiver's declaration states that the remaining fees are not chargeable to Monterey County and requests that Defendants pay the remaining $50,332.04 in attorneys' fees for the relevant period.

The Court having considered the relevant declarations and Defendants' objections, Defendants will be ordered to pay attorneys' fees of $50,332.04 for the period May 1, 2006 through October 31, 2006.

**B.     United States' Motion To Clarify Order Appointing Equitable Receiver**

The Court's order of April 9, 2002 appointing the equitable receiver ("Receivership Order") stated in relevant part that "Defendants shall be responsible for compensation of the Receiver and of any and all persons employed by the Receiver in carrying out the provisions of this Order."

Defendants subsequently requested and received from the California Public Utilities Commission ("PUC") surcharges to compensate them for receivership costs. On February 27, 2003, the PUC issued Resolution W-4373, approving a surcharge of $9.50 per customer per month for twelve months with respect to customers of Toro Water Service ("Toro"). This surcharge resulted in increased revenues of $43,355 for Toro. On March 13, 2003, the PUC issued Resolution W-4377, approving a surcharge of $9.50 per customer per month for twelve months with respect to customers of the smaller water systems, Moss Landing Water Service, Inc. ("Moss Landing"), North Monterey County Water Service, Inc. ("NORMCO"), Blackie Road Water System #18 ("Blackie Road"), San Jerardo Water System ("San Jerardo"), Vierra Canyon Water System ("Vierra Canyon"), Langley/Valle Pacifico Water System ("Pacifico") and

2

Buena Vista Water System ("Buena Vista"). This surcharge resulted in increased revenues of $77,226.

In June 2006, Defendants filed Advice Letter No. 109, seeking approval of an additional surcharge to cover receivership costs. The request affects customers of the Salinas division, Buena Vista and San Jerardo, but does not affect customers of NORMCO or Moss Landing. Also in June 2006, Defendants filed Advice Letter No. 56, seeking approval of a similar additional surcharge with respect to customers of Toro. On July 25, 2006, the PUC approved a surcharge of $3.82 per customer per month for twelve months, resulting in a total annual surcharge of $45.81 per customer. The total gross revenues received by Defendants as a result of the 2006 surcharges is not clear from the briefing.

The United States asserts that Defendants' conduct in obtaining these surcharges – and thus passing the costs of the receivership through to their customers – is inappropriate because the Court's Receivership Order clearly placed responsibility for paying the receivership costs on Defendants individually. The United States requests clarification of the Receivership Order to prohibit Defendants from continuing to pass the costs of the receivership through to customers by means of a surcharge or similar mechanism. Specifically, the United States asks that the Court direct Defendants to file a further advice letter asking the PUC to discontinue the receivership-related surcharges presently in effect. The United States also suggests that the Court consider whether to require Defendants to disgorge the receivership-related surcharges they already have collected.

Defendants assert that this Court lacks jurisdiction to interfere with the rate orders of the PUC, citing among other authorities the Johnston Act, which reads in its entirety as follows:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
>
> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
> (2) The order does not interfere with interstate commerce; and,
> (3) The order has been made after reasonable notice and hearing; and,
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342. Defendants' argument misses the mark. The United States is not asking this Court to interfere with a decision of the PUC. Rather, the United States is asking that this Court order Defendants to stop passing receivership costs through to customers by means of surcharges.

Defendants assert that the PUC had all relevant information before it when it approved the surcharges in question, and that its decision to permit receivership costs to be passed through to customers was a deliberate one. However, the record does not reflect that the PUC ever was presented with or addressed the question of whether the pass-through of costs conflicts with the terms of this Court's Receivership Order, or whether the pass-through of costs is fair and equitable in light of this Court's findings of fact concerning Defendants' past conduct.

Defendants also assert that the receivership costs appropriately are borne by the persons and entities who benefit from the Receiver's services, i.e., the customers. That argument ignores completely the *years* of hardship imposed upon those very same customers by Defendants' wrongful conduct, and the fact that the receivership costs would not be necessary at all but for Defendants' malfeasance.

The clear intent of the Court's Receivership Order was to require *Defendants* to pay the costs of the receivership. It was improper for Defendants to pass those costs through to customers in the form of surcharges. Accordingly, Defendants will be ordered to request that the PUC discontinue the surcharges immediately.

Defendants also will be ordered to disgorge the surcharges they have collected from 2006 onward. While the surcharges collected beginning in 2003 were equally inappropriate, a significant period of time passed without any party objecting to those surcharges. Because the surcharges were a matter of public record, the Court concludes it would be inequitable to force Defendants to unwind those transactions nearly four years later. However, the additional surcharges approved in 2006 are still in effect. Defendants sought those surcharges even after it had become clear that this Court's order imposing the receivership would not be overturned on appeal and that the smaller systems would be sold. Accordingly, Defendants will be required to provide a prompt accounting of receivership-related surcharges collected since July 2006 and to make immediate payment of the funds to the Receiver, who shall hold them pending further

4

order of the Court as to their disposition. Defendants likewise will be required to deposit any revenue from ongoing receivership-related surcharges with the Receiver pending an order by the PUC discontinuing the surcharges.

The Court will request further briefing as to the appropriate disposition of the funds. Among other things, the Court will consider the practicalities of refunds to the customers from whom the funds were collected. The Court also will consider whether the funds might be applied toward the cost of the Moss Landing bridge pipeline, discussed below. The parties shall address these and any other alternatives in their briefs.

Defendants request that all future receivership reports contain more specificity as to the services provided to each water system by the Receiver. the Court agrees with Defendants that while the Receivership Order does impose receivership costs upon all Defendants jointly and severally, Defendants are entitled to know which costs were incurred on behalf of which water systems.

**C.     Receiver's Motion For Reconveyance Of Deeds**

The Receiver asserts that Alisal has conveyed property interests belonging to the smaller water systems to various trusts, and that such interests must be reconveyed to Alisal so that the sales of the smaller systems can be completed. The Trust Defendants assert that they have reconveyed all interests belonging to the smaller systems by means of quitclaim deeds to the Receiver. The Trust Defendants maintain that such quitclaim deeds are the proper means of conveyance, but they also state that they will reconvey the interests in a different form if the Court so orders.

All parties appear to agree that the interests of the smaller water systems must be conveyed out of the trusts so that sales of the smaller systems can be completed. The Receiver filed a supplemental memorandum on February 21, 2007 describing the successful resolution of the reconveyance issues with respect to the Buena Vista Water System. The Court will direct the Receiver and the Trust Defendants to meet and confer in an effort to resolve the issues with respect to the other small water systems. If the parties cannot reach resolution, the Receiver may file a renewed motion identifying with particularity what interests he believes need to be

reconveyed and providing proposed deeds or other conveyance documents with respect to each such interest.

### D. Allocation Of Financial Responsibility For The Main Extension Agreements And The Moss Landing Bridge Pipeline

On April 13, 2004, the Court issued an order ("Sale Order") directing the Receiver to sell Toro to California American Water Company for $408,000; Buena Vista to California Water Service for $300,000; Moss Landing to Pajaro/Sunny Mesa Community Services District ("PSMCSD") for $15,000; NORMCO to PSMCSD for $15,000; Blackie Road to PMCSD for $1,000; Vierra Canyon to PSMCSD for $1,000; and Pacifico to PSMCSD for $1,000.

The PSMCSD bids for Moss Landing and NORMCO were not the highest bids – California American Water Company had bid $126,000 for Moss Landing and California Water Service had bid $200,000 for NORMCO. In its order of May 20, 2004, imposing a $500,000 civil penalty on Defendants for their wrongdoing ("Penalty Order"), the Court acknowledged that the difference between the bids accepted from PSMCSD and the highest bids for these systems was approximately $300,000. The Court explained in its Sale Order that great weight had been given to the letters, petitions and oral comments of the customers of these systems, which overwhelmingly favored transfer to PSMCSD, a non-profit public agency. Sale Order at 2. The Court also was influenced by PSMCSD's representations that, as a public agency, it is eligible for grants and low interest loans not available to privately owned utilities. PSMCSD Letters dated 5/7/2002 and 5/6/2003. These representations were particularly important to the Court given the obvious necessity for significant capital expenditures to the systems. The Court alleviated any inequity to Defendants resulting from the acceptance of PSMCSD's lower bids by crediting Defendants $300,000 toward the $500,000 civil penalty, and requiring Defendants to pay only $200,000 as an actual cash penalty.

Following the Sale Order, the Receiver continued to operate the systems through February 5, 2005, at which time PSMCSD took over operations. However, title has not yet transferred to PSMCSD. Issues have arisen as to who is responsible for paying on the main extension agreements relating to NORMCO, and who is responsible for paying for the Moss

Landing bridge pipeline that was installed in 2005-2006. The Court solicited and received extensive briefing on these issues, and conducted a full-day evidentiary hearing on March 1, 2007. Based upon all of the evidence in the record, including the testimony and exhibits presented at the hearing, the Court concludes as follows:

**1.     Main Extension Agreements**

Main extension agreements commonly are used by privately owned water utilities to fund infrastructure for subdivisions. The developer installs the pipes, fittings and associated materials, and then recaptures the funds expended on these improvements over time from the water customers. Each customer's monthly water bill includes an amount authorized by the PUC to reimburse the developer's costs. The water utility passes these amounts on to the developer.

PSMCSD asserts that it first discovered the NORMCO main extension agreements, totaling approximately $273,000 in obligations, in March 2005. PSMCSD asserts that the obligation to pay belongs to Defendants and that PSMCSD should not have to honor an encumbrance that Defendants placed upon PSMCSD's future revenue stream from NORMCO.

Based upon the testimony presented at the hearing, it appears that the manner in which Defendants financed the NORMCO main extensions is standard. The "encumbrance" on the future revenue stream from NORMCO is the rate increase that the PUC approved as a mechanism for repaying the developer of the main extensions. It is not as though Defendants somehow committed to third parties future revenues that PSMCSD otherwise would be entitled to collect. The revenues in question were specifically approved and dedicated to repaying the main extension developer. The approval of the rate increase to generate the revenues in question was a matter of public record. PSMCSD reasonably could have discovered the rate increase, and the corresponding main extension agreements, in the exercise of due diligence. The other purchasers of Defendants' systems in this case, California Water Service Company and California American Water Company, have assumed liability for the main extension agreements for Buena Vista and Toro, respectively. Under these circumstances, the Court concludes that as of February 5, 2005, the date upon which PSMCSD took over operations of NORMCO and thus began collecting the NORMCO revenues – including those dedicated to repayment of the main

7

extension developer – PSMCSD became responsible for the main extension agreements. To the extent that Defendants collected any such revenues prior to February 5, 2005 but failed to transmit them to the developer, Defendants shall do so forthwith.

### 2. Moss Landing Bridge Pipeline

In 2001, Monterey County ("the County") notified Defendants that an existing bridge, upon which Defendants maintained a water pipeline for service to Moss Landing customers, would be removed in the near future and replaced with a new bridge. In a letter dated April 19, 2001, Anthony Voo, a County engineer, stated that since ALCO would be responsible for maintaining service to its existing customers, ALCO likewise would be responsible for the relocation of its water pipeline onto the new bridge and removal of the old pipeline when the old bridge was removed. Tom Adcock testified at the hearing that Mr. Voo had solicited ALCO's design input with respect to placement of the pipeline, and Mr. Voo's letter reflects that ALCO's input had made the County's "planning and design efforts to relocate ALCO water facilities much easier." Letter of 4/19/01.

On July 6, 2001, the County sent Tom Adcock an official "Notice to Relocate" with respect to the bridge water pipeline. The notice indicated that construction was set to begin in Spring of 2002. However, construction did not in fact begin in 2002. Meanwhile, in April 2002, this Court appointed the Receiver to take over operations of the smaller water systems, including Moss Landing, pending sale of those systems. Tom Adcock testified at the hearing that at that point in time nothing was happening with respect to construction of the new bridge. Defendants reasonably believed that if and when the County ultimately did build the new bridge, relocation of the pipeline would be the responsibility of whoever owned the Moss Landing system at the time.

At the time the new bridge was constructed and the new pipeline needed to be installed, Defendants technically still owned Moss Landing, but operation of the system – including collection of revenues – had been taken over by PSMCSD. As of the date it took over Moss Landing, PSMCSD apparently did not know of the imminent construction of the new bridge and necessity of relocating the pipeline, even though the materials given to PSMCSD both before and

after prevailing on its bid for the Moss Landing system expressly mentioned the bridge relocation project, included plans for the relocation, and specified that the relocation would be a future cost to the system. There is no evidence that Defendants deliberately concealed the fact that the bridge ultimately would be moved and that the pipeline would have to be moved with it. Rather, it appears that the pipeline relocation simply dropped off Defendants' radar once the Court imposed the receivership and indicated that the Moss Landing system would be sold, and that in its due diligence inquiry PSMCSD somehow overlooked the fact that the relocation of the bridge pipeline was a significant future capital cost associated with Moss Landing.

After discovering that the County was relocating the bridge and that the pipeline likewise would have to be relocated, PSMCSD's general manager, Joe Rosa, hired a contractor to install the new pipeline under the new bridge. The contract, which was executed in December 2005, was in the amount of $251,233. Mr. Rosa testified that when he signed the contract, he believed that payment of the construction fees was the responsibility of Defendants. Mr. Rosa further testified that he signed the contract only because the Receiver directed him to sign it, that he believed that he was acting as an agent of the Receiver, and that ultimately the cost of the construction would be paid by Defendants. Unfortunately, there appears to have been a miscommunication between Mr. Rosa and the Receiver, because the Receiver denies directing Mr. Rosa to sign the construction contract. The conversation in which Mr. Rosa claims that the Receiver directed him to sign the contract was telephonic, so there is no contemporaneous record as to what actually was said.

PSMCSD repeatedly sought payment of the construction bill from the Receiver, who apparently ignored PSMCSD's letters. Finally, in July 2006, the Receiver informed PSMCSD that the receivership had no money to pay the construction bill. In October 2006, the contractor threatened to sue PSMCSD. PSMCSD borrowed more than $350,000, secured by the district's general fund, to pay the construction bill and accrued interest. There initially was some confusion in the record as to whether PSMCSD actually borrowed money to pay the construction bill or paid the bill out of revenues. It is clear from the record, however, that PSMCSD did borrow the money and that the loan remains outstanding.

Had the necessity for the capital expenditure in question arisen while Defendants still owned *and* operated the Moss Landing system, Defendants clearly would be responsible. Tom Adcock testified that Defendants would have financed the expenditure by seeking a rate increase for Moss Landing customers from the PUC, and would have recouped the expenditure in this manner over a period of years. Because Defendants are not currently operating Moss Landing, however, and shortly will not even be on title, they cannot recoup the construction costs in this manner. The receivership does not have the money to pay the construction costs. It is not clear from the record whether PSMCSD has the funds to pay the construction costs – the parties presented conflicting evidence on this point. However, the Court concludes that PSMCSD ultimately must bear the responsibility for the costs as the current operator and soon-to-be owner of the Moss Landing system.

The Court is mindful that PSMCSD's management sincerely believes that it was misled. However, the Court concludes that PSMCSD should have been aware of the pipeline replacement costs in the exercise of due diligence. Moreover, if PSMCSD understood that the Receiver and/or the Defendants were responsible for paying the construction costs, it should have obtained some written documentation to that effect before signing the construction contract. That being said, the Court is willing to entertain any reasonable approach that would mitigate the financial burden to PSMCSD. As is discussed above, one possibility is to apply some or all of the funds from the 2006 receivership surcharges toward the construction bill. Another possibility is to require Defendants, as the current owners of Moss Landing, to seek a rate increase from the PUC to cover the pipeline replacement costs and wait to transfer title so that PSMCSD may take title subject to that increase. At the hearing, the parties indicated that application and approval of such a rate increase could be accomplished in approximately ninety days. The parties shall address these possibilities in the supplemental briefs referenced above.

//
//
//
//

Case No. C 97-20099 JF (HRL)
ORDER RE OUTSTANDING MATTERS
(JFLC2)

**ORDER**

(1) Defendants promptly shall pay the Receiver's attorneys' fees in the amount of $50,332.04 for the period May 1, 2006 through October 31, 2006;

(2) The Court clarifies its order of April 9, 2002 as follows: the receivership costs shall be born by Defendants jointly and severally and shall not be passed through to customers by means of a surcharge or other mechanism. Defendants immediately shall take all necessary steps to request that the PUC discontinue any surcharges intended to compensate Defendants for receivership costs. Defendants immediately shall pay the proceeds of all such surcharges collected on or after July 25, 2006, including any such proceeds collected in the future, to the Receiver. The parties shall file supplemental briefs, not to exceed ten (10) pages each, within fifteen (15) days of the date of this order, addressing the appropriate disposition of these funds. All future Receiver's reports shall identify with specificity which water systems received the particular services for which Defendants are being charged;

(3) The Receiver and the Trust Defendants shall to meet and confer in an effort to resolve the conveyance issues with respect to the small water systems other than Buena Vista, as to which the issues appear to have been resolved. If the parties cannot reach resolution, the Receiver may file a renewed motion identifying with particularity what interests he believes need to be reconveyed and providing proposed deeds or other conveyance documents with respect to each such interest;

(4) PSMCSD is responsible for the NORMCO main extension agreements as of February 5, 2005. To the extent that Defendants collected revenues dedicated to repayment of the main extension developer prior to February 5, 2005 but failed to transmit them to the developer, Defendants shall do so forthwith; and

(5) PSMCSD is responsible for the costs of the Moss Landing bridge pipeline. However, the Court will entertain any reasonable approach that would mitigate the financial burden to PSMCSD. The parties shall address possible approaches in the supplemental briefing addressed in item (2) above. Such briefing shall be filed within fifteen (15) days of the date of this order.

DATED: 5/23/07

_____
JEREMY FOGEL
United States District Judge

Case No. C 97-20099 JF (HRL)
ORDER RE OUTSTANDING MATTERS
(JFLC2)

1 | Copies of Order served on:

2 | Andrew A. Bassak     abassak@steefel.com, emaestro@steefel.com; wbrooks@steefel.com

3 | Diana Donabedian     ddonabedian@luce.com,

4 | Marc Peter Fairman     Mfairman@pacbell.net,

5 | Paul Daniel Gullion     pauldgullion@aol.com, ndgullion@aol.com

6 | Kevin T. Haroff     kharoff@ssd.com, sdavid@ssd.com

7 | Joe Alfred Izen , Jr     joeizen@joeizen.com, joeslowgo@hotmail.com

8 | Lori Jonas     lori.jonas@usdoj.gov

9 | Jonathan M. Schwartz     jms01@i.frys.com,

10 | S. Gary Varga     Vargalaw@mbay.net, Vargalaw@SBCGlobal.net

11 | Noel Wise     NxW4@pge.com

12 | Charles O'Connor
     U.S. Attorney's Office
13 | 450 Golden Gate Avenue
     P.O. Box 36055
14 | San Francisco, CA 94102

15 | John W. Richardson
     2941 Park Avenue, Suite H
16 | Soquel, CA 95073

17 | John D. Rothman
     United States Environmental Protection Agency
18 | Region IX
     75 Hawthorne Street
19 | San Francisco, CA 94105

20

21

22

23

24

25

26

27

28

12

Case No. C 97-20099 JF (HRL)
ORDER RE OUTSTANDING MATTERS
(JFLC2)